# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JEANETTA STRICKLAND,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | **CASE NO.: CV-03-439-VEH** |
| **v.** | ] | |
| | ] | |
| **MITSUBISHI MOTORS CREDIT** | ] | |
| **OF AMERICA, et al.,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## Memorandum Opinion

## I.    INTRODUCTION

This is a civil action filed by the Plaintiff, Jeanetta Strickland, against

Defendants MMCA, Serra, and JMIC Life Insurance Company, on February 27, 2004.

This matter is before the Court on Defendant Mitsubishi Motors Credit of America,

Inc.'s ("MMCA"), and Serra Mitsubishi's ("Serra") Motions to Dismiss Counts One

and Eight of the First Amended Complaint (doc. 51 and 54).

## II.    ALLEGATIONS OF THE COMPLAINT

The First Amended Complaint makes the following allegations:

8. On or about February 26, 1997, plaintiff Jeanetta Strickland
entered into what she believed to be and was told by Defendants was a
purchase money financing agreement styled as "Diamond Advantage
Plan Retail Installment Sale Contract" with the Defendants for a slightly
used (Dealer's Demonstration Model) 1997 Mitsubishi Montero

automobile. The agreed upon case price for the Montero in this document was $28,022.71. After adjustments for a cash down payment, credit and disability life insurance and other fees, the amount to be financed was defined in this document as $26,991.29. On February 27, 1997, Ms. Strickland signed a Retail Buyer's Order that included additional terms and conditions for the same vehicle. The agreed upon total sales price in this document was $27,100.

9. Based on the representations made to her, and the documents provided to her by the defendants, Ms. Strickland was led to believe and did in fact believe and reasonably rely on the Defendants' representations that she was purchasing the Montero. In reality, the Defendants created, set up and managed a scheme and arrangement that at all times functioned as, at best, an undisclosed lease in what was a scheme to convert Ms. Strickland's automobile to the Defendants' possession, control and use at the end of the term of the agreement. For example, the agreement required a monthly payment for 47 months and a "balloon" 48th payment , designed to approximate the residual value of the car. The agreement provided that at the end of the term, there would be unspecified wear and tear fees, excess mileage fees and a "disposition fee" not to exceed $350. The plaintiff was also told she was required to purchase credit life and credit disability insurance, which added to the price of the vehicle, as well as her payments. The credit life insurance cost was computed on a 49 month schedule although the financing agreement was for a 48 month period, requiring prepayment for an additional month of insurance for which, based on the terms of the Defendant's contract, was of no value to Ms. Strickland. This additional insurance was in the amount of $453.58. Ms. Strickland was told by the defendants this arrangement was the only way she could qualify for the Montero. Despite the representations that this was the **sale** of the Montero, the defendants included provisions in the agreement which egregiously restricted and limited Ms. Strickland's rights as a "titled owner" Ms. Strickland's only "options" at the end of the agreement were to "sell" (return) the car back to the defendants, pay the defendants the balloon payment or enter into a new financing agreement only with MMCA and Serra. Ms. Strickland was provided no other options within the agreement as to the return of the vehicle. She could neither sell nor

trade the Montero to anyone other than the defendants without the written permission of the Defendants.  In addition, Ms. Strickland could not refinance the Montero with any entity other than the Defendants.

10.  Approximately one month prior to the date of the last payment, a representative of the Defendants went to Ms Strickland's place of employment to "inspect" the Montero.  Then, on the date of the last payment, Ms. Strickland returned the car to Serra, which was represented to her to be what was required of her to complete the transaction.  At the time of the "turn-in"," Ms. Strickland was in fact told she was making a "lease turn-in."  At that time, Ms. Strickland signed an odometer form required by Defendants on which the transaction was noted as a "turn-in."  At the time of this "turn-in," Ms. Strickland was told by Defendants that her obligations were complete under the agreement.  Indeed, Serra took possession of Ms. Strickland's Montero at that time.  However, four months after the return of the automobile, Ms. Strickland received a letter from MMCA requesting payment for unspecified wear and tear, disposition and other unspecified fees.  At that time, the vehicle was sill titled in Ms. Strickland's name. In addition, the remaining balance of the balloon payment is noted as a negative entry on Ms. Stricland's [sic] credit report, despite the fact she turned the vehicle in on February 28, 2001 as required by her agreement with Defendants. Essentially, the Defendants took possession of plaintiff's vehicle and converted that vehicle to its sole use and control, made no payment whatsoever to Plaintiff (or on plaintiff's behalf), and now claim Plaintiff owes additional money.

11.  After Defendants' demands, Ms. Strickland then consulted an attorney, who wrote a letter to MMCA on her behalf.   MMCA responded by reducing the total amount due without explanation, and demanding that the balance be paid under threat of unfavorable credit reporting.

12.   Based on the representations of the Defendants, Ms. Strickland entered into what she was led to believe was a purchase of an automobile.   She was induced to enter the agreement with the Defendants based on fraudulent and false statements related to the

nature of the agreement and her obligations thereunder.  However, at the conclusion of the term, the Defendants, treating the agreement like a lease, took her vehicle without any payment whatsoever (either to Ms. Strickland or to payoff the remaining balance) and left title in Ms. Strickland's name.  Then, four months later, the defendants billed Ms. Strickland for $2,609.90 in unexplained fees (later reduced without explanation to $2,231.09) and made no corrections on Ms. Strickland's credit report.  This has hindered and caused additional expense and distress to Ms. Strickland in obtaining financing of her home and other items.

13.  Based on the Defendant's fraudulent concealment of facts, Ms. Strickland did not become aware, and could not have become aware, of the Defendants' wrongful conduct until within one year of the filing of this Complaint, when the Defendants demanded payment from her, after having accepted Ms. Strickland's vehicle, and made adverse credit reports about Ms. Strickland.

14.  Upon information and belief, the Defendants engaged in a similar pattern and practice of such fraudulent vehicle agreements with customers throughout Alabama and other jurisdictions.

15.  At all times relevant hereto, the defendants regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, and is the person to whom the transaction which is the subject of this action was initially payable, making defendants creditors within the meaning of 15 U.S.C. § 1602(f) and Regulation Z, part 226 2(a)(17).  Moreover, Defendants' regular business activities include leasing and offering to lease motor vehicles. In many cases, the total contractual obligation under the lease is less then $25,000.

*First Amended Complaint*, at 2-5.

### III.   STANDARD OF REVIEW FOR MOTION TO DISMISS

We accept the facts of the complaint as true and view them in the light most favorable to the nonmoving party. *Id.* Dismissal pursuant to Rule 12(b)(6) is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta v. Samples,* 256 F.3d at 1283-84 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

*Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004).

TILA's declaration of purpose states, in relevant part:

> The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms ... would be strengthened by the informed use of consumer credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.  15 U.S.C. § 1601(a). **As a remedial statute, TILA must be construed liberally in favor of the consumer.** *Ellis v. Gen. Motors Acceptance Corp.,* 160 F.3d 703, 707 (11th Cir.1998); *Cody v. Cmty. Loan Corp. of Richmond County,* 606 F.2d 499, 505 (5th Cir.1979).

*Bragg v. Bill Heard Chevrolet, Inc.*, 2004 WL 1418428, *3 (11th Cir. 2004)

[emphasis added].

## IV.   ANALYSIS

### A.   Count One

Count One of the First Amended Complaint reads as follows:

**COUNT ONE – VIOLATION OF THE TRUTH IN LENDING ACT**

16.   Plaintiff adopts and incorporates paragraphs 1 through 15 as if fully set forth herein.

17.   The Defendants, in not properly disclosing the true nature of the finance agreement to Ms. Strickland, violated the Consumer Credit Protection Act (usually referred to as the "Truth in Lending Act"), 15 U.S.C. §§ 1601 - 1667, (hereinafter "TILA") and regulations promulgated thereunder. Defendants further failed to make required disclosures clearly and conspicuously in writing in violation of 15 U.S.C. § 1632(a) and Regulation Z, part 226.17(a) by:

> a.   Including an optional balloon payment into the "amount financed" calculation in violation of 15 U.S.C.§ 1605(a) and Regulation Z, part 226.18(b). Ms. Strickland was not required to make the $15,711.89 balloon payment and did not intend to include this balloon payment in her financing of the vehicle, however the Defendants included this balloon payment into the "amount financed" calculation anyway.  As structured, the amount financed should have only been $15,279.42, which is equal to the $26,991.29 amount financed minus the $15,711.87, balloon payment.

> b.   Making the Plaintiff pay a finance charge on a balloon payment that she ultimately chose not to make,  in violation of 15 U.S.C. § 1605(b) and Regulation Z, part 226.18(b).  Defendants violated TILA by including the $15,711,89 balloon payment

6

in the "amount financed" calculation, and as a result, the Plaintiff paid interest on $15,711.89 for four years that she should not have been required to pay since she exercised her option under the Diamond Advantage Plain Retail Installment Sale Contract to return the vehicle, rather than to make the balloon payment.

c.     Including a $16.50 charge for "Government Certificate of Title Fees Paid to Public Officers" into its calculation of the finance charge and/or amount financed.  Under 15 U.S.C. § 1605(d), such fees are to be excluded from the computation of the finance charge, and thus, Defendants have violated TILA.

d.     Structuring the Diamond Advantage Agreement to appear to be a sale, inducing the plaintiff and other customers into believing they were "buying" a vehicle, when in reality, the transaction was a disguised lease.  This false representation violates 15 U.S.C. § 1605(a), and Reg. Z, parts 226.18(b)-(e), (g), (h) and (j).

18.     The Defendants also failed to disclose that Credit Life and Disability Insurance were inappropriate for the type of agreement entered into by Ms. Strickland, and improperly required Ms. Strickland to purchase an additional 49th month of Credit Life insurance.  Even if the Defendants did **not** require the Plaintiff to purchase credit life and disability insurance in order to purchase the vehicle, the Defendant violated 15 U.S.C § 1605(b) and Regulation Z, part 226.17(a) by including these charges into its calculation of the finance charge and/or amount financed.

19.     As a proximate consequence of the Defendants' violations of TILA, the Plaintiff was injured and damaged.  By reason of the aforesaid violations of TILA, defendants are liable to plaintiff in the amount twice the finance charge, actual damages to be established at

7

trial, and attorneys' fees and costs in accordance with 15 U.S.C. § 1640.

*First Amended Complaint,* at 5-6.

The Defendants first contend that the transaction at issue is exempt from TILA. When TILA was first adopted, Congress directed the Federal Reserve Board to "prescribe regulations to carry out [its] purposes . . .'  15 U.S.C. 1604(a).   In accordance with this directive, the Federal Reserve Board issued Regulation Z, 12 C.F.R. 226.  Further, the Federal Reserve Board staff has issued the Official Staff Commentary on Regulation Z.  As the United States Supreme Court has explained, "Congress has specifically designated the Federal Reserve Board and staff as the primary source for interpretation and application of truth-in-lending law."  *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980).  Accordingly, unless they are "demonstrably irrational," Federal Reserve Board staff opinions construing TILA or its regulations "should be dispositive."  *Id.* at 565.  *See also Johnson v. Fleet Finance, Inc.*, (11th Cir. 1993) ("The office staff interpretations of Regulation Z, unless demonstrably irrational, are binding.")(citing *Milhollin*).  Thus, the principle sources of TILA law are the Act itself, Regulation Z, and the Official Staff Commentary on Regulation Z.

The Truth in Lending Act "does not apply to . . . [c]redit transactions . . . in which the total amount financed exceeds $25,000.00."  15 U.S.C. § 1603(3).  In their

8

Complaint, the Plaintiffs state that in the "Diamond Advantage Plan Retail Installment Sale Contract", the instrument which is the subject of Count One, "the amount to be financed was defined . . . as $26,991.29." The contract is clear as to what the total amount financed was to be. *See Diamond Advantage Plan Retail Installment Sale Contract*, at 1.[1]

However, the Plaintiff insists that the Court must add up the "total contractual obligation" owed by the Plaintiff in order to determine whether the provisions of the contract fall within TILA. This approach would have the court considering amounts *paid in cash up front* by the Plaintiff (such as the Plaintiff's $3,000 down payment), but not balloon payments *clearly owed*. In support of this argument the Plaintiff cites only district court opinions from other districts and some from other circuit–none of which are binding on this Court. The court is not persuaded by these opinions.

The court *is* persuaded by the actual language of the contract itself, which shows the total amount to be financed as $26,991.29. The Court also notes that the Complaint and Plaintiff's Brief allege that the only cash paid by the Plaintiff in this transaction was the $3,000 down payment, and that the purchase price of the vehicle was $28,022.71 (the price that appeared in the Installment Sales Contract at issue in

_____

[1] Where, as here, a document referred to in the complaint is central to the plaintiff's claims it is properly considered on a Rule 12(b)(6) motion to dismiss so long as its authenticity has not been challenged. *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002).

this case).  Simple math would reveal that the amount left to be financed would be at least $25,022.71–over the TILA limit.

Neither is Plaintiff's argument persuasive that the balloon payment should not be included in the total amount financed because it is an "optional" payment.  It is clear from the contract that the Plaintiff is obligated to make the payment of the balloon payment under the contract.  The contract clearly states that she must make "47 regular payments" of "$389.88" and "One final payment" of "15,711.87".  There is nothing "optional" about any of these payments.  In addition, in the "Truth in Lending Disclosures" it clearly reads that the "Total of Payments" or "The amount you will have paid after you have made all payments as scheduled" is "$34,036.23".  This last number is the sum of the payments outlined above.  From the language presented, the Plaintiff was obligated to pay these amounts, and these amounts were included in the contract.

Because the total amount financed exceeds $25,000.00, TILA does not apply, and, as to Count One, the Motions to Dismiss are due to be **GRANTED**.

**B.    Count Eight**

Count Eight of the First Amended Complaint reads as follows:

**COUNT EIGHT – INVASION OF PRIVACY**

42.  Plaintiff adopts and incorporates paragraphs 1 through 41 as

if fully set forth herein.

43.  On July 31, 2001, Robert Hensley, Jr., retained counsel for the plaintiff, wrote the defendants with respect to the vehicle and disputed payments.  At that time, the defendants were placed on notice that Ms. Strickland was represented by counsel.  After that date and notification,  representatives of the defendants called Ms. Strickland at home and asked her to contact the defendants about this matter.

44.  This contact with a person the defendants knew to be represented by counsel amounts to an invasion of the plaintiff's privacy. As a proximate consequence of this invasion of privacy, Ms. Strickland was injured and damaged.

*First Amended Complaint*, at 10.

The Alabama Supreme Court has stated:

"This Court defines the tort of invasion of privacy as the intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Carter v. Innisfree Hotel, Inc.*, 661 So.2d 1174, 1178 (Ala.1995) (citing *Nipper v. Variety Wholesalers, Inc.*, 638 So.2d 778 (Ala.1994); *Phillips v. Smalley Maint. Servs., Inc.*, 435 So.2d 705 (Ala.1983); *Alabama Elec. Co-operative, Inc. v. Partridge*, 284 Ala. 442, 225 So.2d 848 (1969)).

*Rosen v. Montgomery Surgical Center*, 825 So.2d 735, 737 (Ala., 2001).[2]   The

Complaint in this case is devoid of *any* allegation that the Plaintiff experienced

_____

[2]There are actually four species of invasion of privacy in Alabama.  The Plaintiff cites the Court to this case in particular, however, and writes, "[i]n the instant situation, we are clearly dealing with the "wrongful intrusion" prong of invasion of privacy."  *Plaintiff's Reply to Motion to Dismiss*, at 11-12.

outrage or was caused to have mental suffering, shame, or humiliation.  Indeed, the Court is hard pressed to imagine the situation where a "person of ordinary sensibilities" would be so affected by a single phone call from the Defendants asking the Plaintiff to call them about this matter.  Nor does the Complaint allege that the *manner* of the call was inappropriate, other than the fact that it was done after the Defendants had been put on notice that the Plaintiff had retained counsel concerning the matter.  That being understood, it could hardly be said that the matter was private.

The Motions to Dismiss Count Eight are due to be **GRANTED**.

**DONE** this 13th day of July, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

12